UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

NORMAN GRAICHEN
SHARON L. MCNULTY GRAICHEN


     VS                                                 C.A. NO.:  16-153S

WELLS FARGO BANK, N.A.,
ALIAS AND JOHN DOE, ALIAS
AND HARMON LAW OFFICES, PC

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS BY WELLS FARGO BANK, N.A.

## INTRODUCTION


This matter is before the Court on Wells Fargo Bank N.A.'s ("Wells Fargo") Motion for Judgment on the Pleadings.   On March 1, 2016 Plaintiffs filed a complaint against Wells Fargo Bank, N.A. and Harmon Law Offices, P.C., The allegations against Wells Fargo are that it violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e and 1692 f(6). The allegations against Wells Fargo and Federal Home Loan Mortgage Corporation ("Freddie Mac") are that the owner of the mortgage violated the provisions of  the Truth in Lending Act,  15 U.S.C 1638 and  by virtue of the amendments of the Dodd Franks Act and Regulation Z, 12 C.F.R. 1026.41 by not sending transmitting to the Plaintiffs accurate periodic monthly statements from March 2015 through March 1, 2016 (and now ongoing). A review of the travel of the case, the pleadings and the

relevant case law mandate that the Motion for Judgment on the Pleadings is not well founded and should be denied. The facts of this case as alleged in the pleadings are quite concise and recite plausible allegations. On March 2, 2015, Harmon Law Offices, P.C. ("Harmon") on behalf of Wells Fargo sent the Plaintiffs a letter pursuant to R.I.G.L. § 34-27-4, purporting to schedule a foreclosure sale on their home on April 23, 2015. The sale was advertised three times and Harmon on behalf of Wells Fargo hired an auctioneer who conducted a purported foreclosure sale. This auctioneer was Commonwealth Auction Associates, Inc. ("Commonwealth"), a corporate affiliate of Harmon, with the same business address as Harmon of 150 California Street, Newton, Massachusetts, with the same registered agent, Mark P. Harmon and which had two directors, Mark P. Harmon and Andrew S. Harmon, who was the only officers of Harmon. On April 23, 2015 a purported sale occurred and the property was claimed to have been sold to an individual named Robert Primeau, who immediately commenced communications with the Plaintiffs in an attempt to cause them to move out of their home. As a result, Plaintiffs first hired one attorney, Peter Iascone and then attorney John B. Ennis regarding the matter, both of whom communicated with Harmon and Wells Fargo. At no time was a foreclosure deed recorded.

## THE PLEADINGS ESTABLISH LIABILITY AGAINST WELLS FARGO PURSUANT TO THE FDCPA

The Plaintiffs alleged specific facts in the complaint against Wells Fargo.

They made the following allegations, which if true would establish liability against

Wells Fargo. However Wells Fargo refused to answer certain allegations or denied

certain allegations. These allegations are as follows:

2.      Defendant, Federal Home Loan Mortgage Corporation ("Freddie Mac"), is a corporation created by an Act of Congress. It claims to own Plaintiffs' mortgage.

2.      **Wells Fargo & FHLMC Answer:**     Defendants admit only that FHLMC is a government sponsored enterprise and that it is the Investor on the Mortgage. Otherwise denied.

3.      Wells Fargo Bank, NA ("Wells Fargo") is a national bank. It is a debt collector and asserts that it is the loan servicer for the Plaintiffs' mortgage. It throughout all of its communications with the Plaintiffs has collected a debt on behalf of Freddie Mac under the fictitious name of Wells Fargo Home Mortgage.

3.      **Wells Fargo & FHLMC Answer:**     Defendants admit that Wells Fargo is a national bank and that it is, and at all relevant times has been, the servicer of the Mortgage. Defendants deny the remaining allegations of paragraph 3.

4.      Harmon Law Offices, PC ('Harmon") on March 2, 2015 sent a Notice to Plaintiffs on behalf of Wells Fargo, which scheduled a foreclosure sale for Plaintiffs' home on April 23, 2015. This Notice was sent to Plaintiffs by regular mail and certified mail return receipt requested.

4.      **Wells Fargo & FHLMC Answer:**     Upon information and belief, Defendants admit that HLO sent a mortgage foreclosure notice on March 2, 2015. The notice speaks for itself and Defendants deny any and all allegations inconsistent therewith.

6.     Pursuant to the terms of the mortgage, a Notice of a Foreclosure sale could not be commenced without the Lender first sending to the Plaintiffs a Notice of Default pursuant to the terms of the mortgage.

6.     **Wells Fargo & FHLMC Answer:**     The allegations of paragraph 6 are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations of paragraph 6.

7.     Neither Wells Fargo, Freddie Mac nor any entity acting on their behalf sent the Plaintiffs a Default Notice pursuant to the terms of the mortgage.

7.     **Wells Fargo & FHLMC Answer:**     Denied.

8.     Harmon and Wells Fargo, though Harmon threatened to and did publish advertisements of a foreclosure sale of Plaintiffs' home.

8.     **Wells Fargo & FHLMC Answer:**     Defendants admit that Harmon published statutory notice of the foreclosure via advertisement.  Otherwise denied.

9.     Harmon and Wells Fargo, though Harmon threatened to and did schedule an auction of the Plaintiffs' property on April 23, 2015.

9.     **Wells Fargo & FHLMC Answer:**     Defendants admit that Harmon scheduled a foreclosure auction for the property on April 23, 2015.  Otherwise denied.

10.     Harmon and Wells Fargo, though Harmon conducted a purported foreclosure sale of the Plaintiffs' home on April 23, 2015 and purported to sell the Plaintiffs' home to a third party.

10.     **Wells Fargo & FHLMC Answer:**     Defendants admit that a foreclosure auction was held and that a third part has the highest bid.  Otherwise denied, and noted that the foreclosure sale was not completed.

11.     As a result of the purported foreclosure sale, a third party purportedly purchased Plaintiffs' home.

11.     **Wells Fargo & FHLMC Answer:**     The allegations of paragraph 11 are a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations of paragraph 11.

12.     Wells Fargo is a debt collector as defined by 15 U.S.C. § 1692 et seq. It regularly collects debts for other entities. In fact it regularly referenced itself as a debt collector in all its communications with the Plaintiffs.

12.     **Wells Fargo & FHLMC Answer:**     Wells Fargo denies the allegations of paragraph 12.  FHLMC does not respond because Count I is not asserted against it.

13.     In all its communications with the Plaintiffs, Wells Fargo communicated to the Plaintiffs using a fictitious name of Wells Fargo Home Mortgage.

13.     **Wells Fargo & FHLMC Answer:**     Wells Fargo denies the allegations of paragraph 14.  FHLMC does not respond because Count I is not asserted against it.

15.     Harmon and Wells Fargo since March 1, 2014 have committed several violations of the FDCPA and are liable to the Plaintiffs for compensatory damages, statutory damages, and attorney fees and costs for violations.

15.     **Wells Fargo & FHLMC Answer:**     Wells Fargo denies the allegations of paragraph 15.  FHLMC does not respond because Count I is not asserted against it.

16.     Harmon and Wells Fargo have used multiple followings unfair and unconscionable means to collect or attempt to collect a debt against the Plaintiffs.

16.     **Wells Fargo & FHLMC Answer:**     Wells Fargo denies the allegations of paragraph 15.  FHLMC does not respond because Count I is not asserted against it.

17.     Harmon on behalf of Wells Fargo and Wells Fargo, through Harmon threatened to commence a non-judicial foreclosure to effect dispossession of the Plaintiffs of their property even though  pursuant to the terms of the mortgage and the failure to send a default letter, Wells Fargo and Freddie Mac lacked the  present right to possession of the property claimed as collateral through an enforceable security interest.  They also threatened to take legal action that they were not

authorized to take. Specifically, Harmon and Wells Fargo committed the following violations in this regard:

    a.    On about March 1, 2015, Wells Fargo on behalf of Freddie Mac had sent, through its attorney Harmon, four Notices of Foreclosure to Plaintiffs. Two of these were sent by certified mail and two were sent by regular mail. This notice purported to schedule a foreclosure sale of the plaintiff's property, even though it had no contractual or statutory ability to conduct such a sale.

    b.    Harmon and Wells Fargo have caused the publication of foreclosure advertisements of a foreclosure sale of Plaintiffs' home.

    c.    Harmon and Wells Fargo hired and authorized an auctioneer to appear at the Plaintiffs' home on April 23, 2015 to conduct a foreclosure sale.

    d.    On every monthly statement sent to the Plaintiffs from March 1, 2015, Defendant, Wells Fargo made a false statement as to the amount of the debt of the Plaintiffs in an attempt to collect a debt.

17.    **Wells Fargo & FHLMC Answer:**    Wells Fargo denies the allegations of paragraph 17, including all subparts. FHLMC does not respond because Count I is not asserted against it.

18.    The facts alleged in this complaint establish that Harmon and Wells Fargo by threatening to foreclose on Plaintiffs' property violated 15 USC 1692e(5) by threatening to take an action that could not be legally taken. They could not commence a non-judicial foreclosure without sending a default letter pursuant to the terms of the mortgage.

18.    **Wells Fargo & FHLMC Answer:**    Wells Fargo denies the allegations of paragraph 18. FHLMC does not respond because Count I is not asserted against it.

19.    Each action of Harmon and Wells Fargo described above constitutes a separate violation of the FDCPA for which Harmon and Wells Fargo are liable.

19. **Wells Fargo & FHLMC Answer:** Wells Fargo denies the allegations of paragraph 19. FHLMC does not respond because Count I is not asserted against it.

20. The purported foreclosure action and all actions to seek to foreclose on the property have occurred within one year of the filing of this complaint.

20. **Wells Fargo & FHLMC Answer:** Admitted. FHLMC does not respond because Count I is not asserted against it.

21. The Plaintiffs have incurred actual damages in regard to this action:

a. They have incurred costs for gasoline to visit their attorney on at least six occasions, driving to their attorney's office for a round trip totaling 50.18 miles. The IRS standard mileage allowance provides for .56 per mile.

b. They have incurred attorney fees and costs in order to obtain legal assistance to rescind the purported foreclosure and to undo the illegal actions of the Defendants. Their fee agreement with their attorney provides that they will be responsible for legal fees expenses incurred in regard to this action. They have agreed to pay legal fees at the rate of $400.00 per hour or out of Court legal work and $450.00 per hour for in Court legal work.

c. They have incurred emotional distress and anxiety when they were advised by the purported purchaser at the foreclosure sale that they were required to leave their home.

d. They have incurred legal fees and costs for the prosecution of this action. Their fee agreement with their attorney provides that they will be responsible for legal fees expenses incurred in regard to this action. They have agreed to pay legal fees at the rate of $400.00 per hour or out of Court legal work and $450.00 per hour for in Court legal work.

21. **Wells Fargo & FHLMC Answer:** Denied, including all subparts, FHLMC does not respond because Count I is not asserted against it.

27.     Defendant, Federal Home Loan Mortgage Corporation is the entity which claims to own and hold the Plaintiffs' note and mortgage.

27.     **Wells Fargo & FHLMC Answer:**     Defendants admit that FHLMC is the holder of the note, but deny the remaining allegations of paragraph 27.

These denials and equivocal answers establish that there is a factual dispute which precludes granting the Motion for Judgment on the Pleadings. Plaintiffs have alleged that Wells Fargo is a debt collector and in fact all of its communications to the Plaintiffs has indicated that it is a debt collector.  In its original communication to the Plaintiffs, referenced in this  menorandum and which will be referenced in a proposed amended claim, it stated that it was a debt collector. Plaintiffs have alleged in paragraph 3 and 12 that Wells Fargo regularly collects debts for other entities and that the majority of the business of Wells Fargo is as a Debt Collector. Wells Fargo denied these specific allegations in paragraphs 3 and 12. However Plaintiffs have also alleged  in paragraph 3 the following specific allegation:

3.     Wells Fargo Bank, NA ("Wells Fargo") is a national bank. It is a debt collector and asserts that it is the loan servicer for the Plaintiffs' mortgage. It throughout all of its communications with the Plaintiffs has collected a debt on behalf of Freddie Mac under the fictitious name of Wells Fargo Home Mortgage.

Wells Fargo has denied this allegation. However the provisions of 15 U.S.C. 1692e(6)  prohibits an entity from seeking to collect a debt by using  a name other than its own name.  This section prohibits:

**(14)**
The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

Ironically, although Wells Fargo is a loan servicer, it since February 18, 2015 has been the titled owner of the mortgage. On August 7, 2014 the mortgage was assigned to Federal Home Loan Mortgage Corporation ("Freddie Mac") and recorded in Book 1554 Page 336 of the Land Evidence Records of the Town of South Kingstown. It then was assigned by Freddie Mac to Wells Fargo on January 26, 2015 in Book 1568 Page 94 of the Land Evidence Records of the Town of South Kingstown. In fact in its two letters on behalf of Wells Fargo Home Mortgage, Harmon indicated on August 4, 2014 and January 5, 2014 that it was accelerating the mortgage loan on behalf of Freddie Mac. However on February 18, 2015, another assignment of mortgage was recorded from Freddie Mac to Wells Fargo. Thus the chain of title from origination has been an original mortgage to Wells Fargo Bank, N.A., then in 2014 to Freddie Mac then and then prior to the attempted foreclosure to Wells Fargo Bank, N.A. On December 30, 2015, Harmon on behalf of Wells Fargo sent a letter ("Exhibit 1") to the Plaintiffs indicating that it had been instructed to bring a foreclosure in the name of Wells Fargo Bank, N.A. In addition to this assertion that Wells Fargo was the creditor, in its answer to paragraph 2, Wells Fargo denied that Freddie Mac was the owner of the Plaintiffs' mortgage and admitted only that Freddie Mac was the investor. A

fair reading of the pleadings and the Exhibits and the chain of title would lead to a

reasonable conclusion that Wells Fargo was actually the creditor and sought to

collect its own debt by using the name of Wells Fargo Home Mortgage in all its

statements.  Such would be a violation of the FDCPA, section 1692a(6) which

imposes liability on a creditor which uses a name other than its own in attempts to

collect a debt.  Since Wells Fargo has been quite equivocal and evasive  in its

answer and in its memorandum regarding the actual ownership of the mortgage

loan and that the loan has never been assigned, such actions could lead to liability

pursuant to 1692a(6).  This Court in *Pimental,* cited above held:

Plaintiffs have adequately pled that it falls into the exception for a "creditor who, in
the process of collecting his own debts, uses any name other than his own which
would indicate that a third person is collecting or attempting to collect such debts."
See 15 U.S.C. § 1692a(6). Wells Fargo is correct that Plaintiffs did not plead that
its principal purpose is debt collection (nor could they), but this is irrelevant to
whether Wells Fargo nonetheless falls into the creditor exception, as the R&R
found.

 In view of the answer of the Defendants, if the assignment of mortgage conveyed

the mortgage to Wells Fargo, then Plaintiffs will file an amended complaint

consistent with the  position  of  Freddie Mac and Wells Fargo that Freddie Mac

does not own the mortgage and is merely an investor. Thus an amended complaint

should be allowed to be filed to plead based on the stance of Wells Fargo and

Freddie Mac.

**WELLS FARGO WAS ACTING AS A DEBT COLLECTOR WHEN IT AUTHORIZED HARMON TO SEND A NOTICE OF FORECLOSURE SALE PURSUANT TO R.I.G.L. §34-27-4 AND WHEN IT SENT INACCURATE MONTHLY STATEMENTS TO THE PLAINTIFFS IN AN ATTEMPT TO COLLECT A DEBT**

Plaintiff rightfully contends that Wells Fargo Bank, N.A., is a debt collector. Pursuant to 15 USC § 1692 e(14) Wells Fargo Bank, N.A., committed a deceptive practice by the use of a business name when there its true name. In this case Well Fargo Bank, N.A., used the fictitious name of Wells Fargo Home Mortgage on all its communications to the Plaintiffs. This fact also establish the status of Wells Fargo as a debt collector. The terms of Plaintiffs' mortgage provided that prior to commencing any non-judicial foreclosure pursuant to R.I.G.L. § 34-27-4, the lender was required to send a Notice of Default to the Plaintiffs. The Pleadings in this case clearly establish that the Plaintiffs were not provided such a Notice. Plaintiff has sufficiently pleaded facts that a condition precedent for the exercise of the statutory power of sale as established by the mortgage had not been met. Plaintiffs are prepared to file an amended complaint alleging that the provisions of paragraph 22 of their mortgage were not complied with and that a valid default notice was not sent to them, resulting in the initial foreclosure notice to be invalid. The lender failed to comply with the terms of the mortgage when it conducted the purported foreclosure. Instead, Wells Fargo using the fictitious name of Wells Fargo Home Mortgage sent a defective default letter to the Defendant. Paragraph

22 of the mortgage provided that **before any alleged acceleration of the loan was declared,** the **Lender** was required to specify:

a.     the default;

b.     the action required to cure the default, stating a date, not less than 30 days from the date the default must be cured;

c.     that failure to cure the default on or before the date specified in the Notice **may result in the acceleration** and the right to bring a court action to asset the non-existence of a default of Borrower to acceleration and sale.

Paragraph 22 of the Plaintiffs mortgage, which contains conditions for

theexercise of the statutory power of sale, reads as follows:

> Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Specifically, the provisions in paragraph 22 of the mortgage were a condition precedent to the exercise of the power of sale of the mortgage. There was no strict compliance with the terms of the mortgage to exercise the statutory power of sale as indicated above. No default letter was sent to Plaintiffs by the Lender in conformity with the terms of the Mortgage. Thus any alleged subsequent notice of foreclosure letter was void and invalid due to the failure of the lender to comply with the terms of the mortgage. Since no default letter, consistent with the terms of the mortgage, was sent, no acceleration and sale could be declared by any entity.

The only purported default notice sent to the Plaintiffs was dated July 16, 2013 and is attached to this Memorandum as Exhibit 2. This letter was not a default notice as required by the terms of the mortgage. A virtually identical letter in regard to this issue was analyzed Judge Finkle of the Rhode Island Bankruptcy Court in the case of *In Re Demers*, 511 B.R. 233 (Bankr R.I., 2014). In *Demers,* the Court reviewed an objection to a Proof of Claim filed by Wells Fargo through its

servicing name of America's Servicing Company.  A notice similar to this notice

was sent to the Debtor prior to a foreclosure, which was stopped by the Debtor's

Chapter 13 bankruptcy filing.  The Court found that strict compliance with

Paragraph 22 of the mortgage was a condition precedent to acceleration and

exercise of the statutory power of sale under Rhode Island law.  The Court held:

> Reading the Note and Mortgage as an integrated contract, I find the loan
> agreement between Ms. Demers and ASC is unambiguous and ASC's
> compliance with Mtg. Paragraph 22 is a condition precedent to its right to
> accelerate the Note and pursue its remedy of foreclosure against the
> Property. That paragraph, in plain and ordinary terms, states that prior to
> accelerating the Note ASC is required to give Ms. Demers notice of "the
> right to bring a court action to assert the non-existence of a default or any
> other defense of Borrower to acceleration and sale." The Notice without
> question did not inform Ms. Demers that she had a right to bring an action in
> court. Quite clearly the Notice did not comply with this prerequisite.
>
> Even so, if I were to determine any ambiguity in a contract "must be
> construed against the drafter of the document," in this case ASC (or its
> predecessor-in-interest). *Haviland,* 45 A.3d at 1260 ( *quoting Fryzel,* 385
> A.2d at 666-67). Furthermore, "virtually every contract contains an implied
> covenant of good faith and fair dealing between the parties." *Dovenmuehle
> Mortg., Inc. v. Antonelli,* 790 A.2d 1113, 1115 (R.I.2002). I see no reason
> this loan transaction should be exempted from this general rule. Indeed, in a
> transaction such as this between an individual homebuyer and a mortgage
> lender, there is an imbalance of power such that the more powerful and
> sophisticated party, ASC, must be held to this standard of good faith and fair
> dealing . . . Notice provisions in mortgage documents usually require default
> notices to contain specific information, which serves a very clear and
> specific purpose; it informs mortgagors of their rights so that they may act to
> protect them. Therefore, when the terms of the note and mortgage require
> notice of default, proper notice is a condition precedent to an action for
> foreclosure.

The Court concluded by holding that:

For unexplained reasons, the Notice sent by ASC upon Ms. Demers' 2012 default deviated from these prior notices and omitted this contractually mandated notice provision. This defect resulted in the invalidity of the foreclosure process ASC pursued and precludes recovery of its associated costs.

Thus pursuant to the Bankruptcy Court's analysis, this paragraph 22 notice was defective, rendering the foreclosure void.

The Massachusetts Supreme Judicial Court analyzed this type of notice in exactly the same manner. In the case of *Pinti v. Emigrant Mortgage Company*, No. SJC-11742 (Ma., July 17, 2015), the Court invalidated a foreclosure where there was not strict compliance with the provisions of paragraph 22. The Court commenced by viewing the extraordinary power that a mortgagee possessed when non-judicial foreclosure commenced with no judicial intervention:

> This court has recently reemphasized the point that in light of "the substantial power that the statutory scheme affords to a [mortgagee] to foreclose without immediate judicial oversight, we adhere to the familiar rule that `one who sells under a power [of sale] must follow strictly its terms'"; the failure to do so results in "no valid execution of the power, and the sale is wholly void." Ibanez, 458 Mass. at 646, quoting Moore v. Dick, 187 Mass. 207, 211 (1905). See Pryor v. Baker, 133 Mass. 459, 460 (1882)("The exercise of a power to sell by a mortgagee is always carefully watched, and is to be exercised with careful regard to the interests of the mortgagor"). This is true with respect to terms that are connected to the power of sale contained in the mortgage instrument itself, [10] and to terms contained in § 21, the statutory power of sale, or in one of "the statutes relating to the foreclosure of mortgages by the exercise of a power of sale" to which § 21 refers.

It then proceeded to analyze the nature of the Paragraph 22 notice:

Insofar as the plaintiffs' mortgage is concerned, paragraph 22 begins by requiring notice of default to be given prior to any acceleration of the sums secured by the mortgage; then specifically prescribes the contents of the notice of default; and then provides that, if the default is not cured before the date specified in the notice, the mortgagee may invoke the statutory power of sale (as well as pursue other remedies). As the paragraph is written, therefore, the sending of the prescribed notice of default is essentially a prerequisite to use of the mortgage's power of sale, because the power of sale may be invoked only if the default is not cured within the time specified in the notice of default. In this regard, we agree with the plaintiffs that the "terms of the mortgage" with which strict compliance is required — both as a matter of common law under this court's decisions and under § 21 [15] — include not only the provisions in paragraph 22 relating to the foreclosure sale itself, but also the provisions requiring and prescribing the preforeclosure notice of default. See Foster, Hall & Adams Co., 213 Mass. at 322-324.

The Court then concluded by holding:

this court's decisions about mortgage terms indicate that by structure and content, the notice of default required to be given under paragraph 22 is integrally connected, and operates as a prerequisite, to the proper exercise of the mortgage instrument's power of sale. Emigrant's strict compliance with the notice of default required by paragraph 22 was necessary in order for the foreclosure sale to be valid; Emigrant's failure to strictly comply rendered the sale void.

Thus the *Pinti* case supports Plaintiffs' position that the notice was void and defective because it did not substantially comply with the terms of the mortgage.

The use of the term "we will proceed with acceleration" rather than "may be accelerated rendered this notice void and the subsequent foreclosure attempt action violated 15 U.S.C. §1692e and 1692 f(6). The violation consisted in the failure to advise the Plaintiffs that they had a right to bring a Court action. Thus was a defective notice, exactly as in *Demers*.

Another recent case, which is appicable to this case  is *Paiva v. Bank of New York Mellon,* 14-cv-14531 D. MA, August 11, 2015. In *Paiva*, the Plaintiff filed a claim that the foreclosure was void due to the fact that the entity which provided the default notice was Countrywide, which was not the lender, which was the entity, which had been assigned the mortgage. The Court agreed holding:

> The language of paragraph 22 is clear and unequivocal as to who must give the required notice of default to the borrower: "Lender" must do so. The Court agrees with *Paiva* that Countrywide's notice of default did not strictly comply with paragraph 22 of the mortgage, as required under the statutory power of sale and under the Massachusetts Supreme Judicial Court's ("SJC") case law. See G.L. c. 183, § 21 (requiring a foreclosing bank to "comply with the terms of the mortgage"); *U.S. Bank Nat. Ass'n v. Ibanez,* 458 Mass. 637, 647 (2011) (the terms of the power of sale, G.L. c. 183, § 21, must be strictly adhered to); see also *Pinti v. Emigrant Mortgage Company, Inc*., 33 N.E.3d 1213, 1226 (2015) (strict compliance with the notice of default required by paragraph 22 is necessary in order for a foreclosure sale to be valid). Paragraph 22 specifically states that "Lender shall give notice to Borrower. . . ." Significantly, it does not say that "Lender or the servicer of the loan shall give notice to Borrower. . . ." Nor is the term "Lender" defined in the mortgage to include the servicer of the loan. Rather, the mortgage defines "Lender" only as "Countrywide Home Loans, Inc." [Dkt. 19-1, at 6.] As discussed above, although Countrywide was the original lender under the mortgage, the parties agree that by the time Countrywide sent the notice of default to *Paiva*, Countrywide had assigned its interest to BONYM, which thereby became the lender. Thus, strictly construing paragraph 22 of the mortgage, BONYM, and not Countryside, had to send the notice of default to *Paiva*.

A similar case resulted in the same result in the Virginia Supreme Court case of  *Bayview Loan Servicing v. Simmons*, 654 S.E.2d 898 (V.A., 2008). In that case, the Virginia Supreme Court considered the same issue and held for the homeowner reversed a foreclosure:

In Paragraph 17 of the Deed of Trust, the parties agreed no right of acceleration would be in existence to exercise (in other words, that no such right would have accrued to Bayview) until the condition precedent of providing the pre-acceleration notice had been satisfied. That condition precedent required a notice by personal delivery or certified mail specifying:

(1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property.

As noted above, this required notice was not given and thus the condition precedent to Bayview's right of acceleration was never met. Because Bayview did not comply with the specific condition precedent under the Deed of Trust, prior to the notice of foreclosure sale by Specialized, Bayview had not acquired the right to accelerate payment under the terms of the Deed of Trust. Thus, Specialized's June 28, 2005, letter could exercise no right of acceleration because no such right had then accrued to Bayview.

As in all of these cases, the defective paragraph 22 notice rendered the Notice of foreclosure void.

Thus despite the clear nature of the terms of the mortgage, Wells Fargo, through its agent Harmon, commenced certain communications with the Plaintiffs in order to collect payment of the mortgage purportedly on behalf of its client, Freddie Mac or itself. The pleadings indicate that this conduct violated 15 USC 1692e and 1692f(6). The first base of liability pursuant to the FDCPA alleges a violation of 15 USC 1692e(5):

The threat to take any action that cannot legally be taken or that is not intended to be taken.

In this case, Wells Fargo through Harmon threatened to take legal action that it could not legally take due to the failure to send the Plaintiffs a default notice pursuant to the terms of the mortgage. In this case, Harmon, on behalf of Harmon, sent Plaintiffs an acceleration notice and in fact purported to conduct a foreclosure sale on April 23, 2015 as alleged in the complaint. Thus on its face, these notices violated the provisions of the FDCPA, section 1692e(5) as they were sent without a prior default notice as required by the terms of the mortgage. The proposed action could not be legally taken and thus as pleaded was a violation of 1692e.

Wells Fargo's conduct in transmitting the R.I.G.L. § 34-27-4 notices to the Plaintiffs by Harmon, also violated another provision of the FDCPA. Section 1692f(6) provides that this notice was a violation of the FDCPA in the case of a debt collector, such as Wells Fargo:

(**6**) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—

(**A**) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

(**B**) there is no present intention to take possession of the property; or

(**C**) the property is exempt by law from such dispossession or disablement.

A review of the pleadings in the complaint, the terms of the mortgage and the exhibits indicates that until a proper default notice was mailed to the Plaintiffs,

Freddie Mac nor Wells Fargo did not have a present right to possession of the property claimed as collateral through an enforceable security interest. Thus neither Wells Fargo or Freddie Mac possessed the right to commence a non-judicial foreclosure on March 2, 2015 The language of the mortgage is quite clear as to the obligation of the lender to send the Plaintiffs a default letter with specific language, which was a precondition to acceleration and sale. Thus the actions of Wells Fargo, through its agent, Harmon, constituted a violation of this provision of the FDCPA as pleaded in the complaint. This aspect of the violation was compounded when Harmon on behalf of Wells Fargo advertised their property for sale three times in a newspaper and hired an auctioneer who claimed to sell their property to attempt and they purported to sell the property, and to collect a debt for Wells Fargo Bank N.A. or Freddie Mac.

## LEGAL ANALYSIS

Defendant seeks Judgment on the Pleadings in the FDCPA case based on the defense that the foreclosure is not debt collection. However as stated above, there was no default letter sent to the Plaintiffs by the lender pursuant to the terms of the mortgage. Thus the pleadings establish that there could be no acceleration nor exercise of the statutory power of sale pursuant to the loan documents, since there was no declaration of default. A mere delinquency does not provide the owner of the mortgage with the right to foreclose, without a valid default letter.

This is the first step in the process of foreclosure, followed by an acceleration

notice and finally a Notice of Sale pursuant to R.I.G.L. § 34-27-4.

Defendant cites *Speleos v. BAC Home Loans Servicing LP*, 824 F. Supp 2 d

226 (D. Mass, 2011).  However *Speleos* can be readily distinguished.  In *Speleos*,

that Plaintiff had filed suit against a law firm claiming that it had violated a duty to

investigate whether that Plaintiff was eligible for HAMP prior to commencing a

nonjudicial foreclosure.  That case also claimed liability arising from the FDCPA

general section 1692f, with no particular facts alleged.  However the Court in

*Speleos* also added:

> Defendant may, of course, still be liable under § 1692f(6), which is
> specifically applicable to the enforcement of security interests. *See Maynard
> v. Cannon, P.C.*,650 F.Supp.2d 1138, 1142-43 (D.Utah 2008) (holding that
> law firm engaged solely to initiate a nonjudicial foreclosure by enforcing the
> security interest was subject only to § 1692f(6)). That subsection prohibits
> enforcing such an interest where there is "no present right to possession of
> the property claimed as collateral." § 1692f(6)(A). The question is thus
> whether Orlans Moran foreclosed on the Property when there was no present
> right to possess it.

This is a section of the FDCPA which Plaintiffs cited in this Memorandum

in support of their claim for relief in the complaint. *Speleos* also did not involve

any claims for Wells Fargo through its agent Harmon acting as a debt collector to

collect a debt and providing the Plaintiffs  information to find out how much they

owed and how to pay Harmon on behalf of Wells Fargo Home Mortgage. Once

Wells Fargo sought to collect debts and through its agent specified the amounts

due and the website to find out the amount of the claim, it became liable for any claims, arising from that conduct for commencing a foreclosure without a valid default letter.

Other cases support the Plaintiffs' position in this matter. In *Shaw v BAC Home Loans Servicing*, LP 10-11021 (D. MA., 2013), the District Court denied a Motion to Dismiss when the loan servicer went forward with a foreclosure. Plaintiff in that case asserted that it was illegal because of the pending modification request. The Court held:

> Shaw states that under the FDCPA, BAC is a debt collector and is prohibited from making a "threat to take any action that cannot legally be taken" and "may not use unfair or unconscionable means to collect or attempt to collect any debt." D. 31 ¶¶ 52-56. Shaw alleges that "[BAC] violated the [cited] sections of the FDCPA because it has threatened, and indeed has scheduled, the foreclosure sale of Plaintiff's home, which action is illegal since it would be in violation of [Massachusetts regulation]." D. 31 ¶ 57. Although this allegation is primarily directed toward the alleged failure to consider her for a loan modification, in light of the Court's allowance as to the claim for wrongful foreclosure, the Court cannot conclude that Shaw's alleged facts supporting her claim of wrongful foreclosure may not also entitle her to relief on her FDCPA claim, where the Court notes that Shaw bases her FDCPA claim on an "illegal" foreclosure and where Shaw has stated sufficient factual allegations to allow that claim to go forward. Accordingly, the Court declines to dismiss this claim.

In *Wilson v Draper & Goldberg*, 443 F. 3d 373 (4th Cir., 2006) the Fourth Circuit held that the FDCPA applies to lawyers conducting a nonjudicial foreclosure, in a case where the attorneys advised the mortgagors the amount that was needed to reinstate. The Court held:

Defendants' argument [that foreclosure was not within FDCPA], if accepted, would create an enormous loophole in the Act immunizing any debt from coverage if that debt happened to be secured by a real property interest and foreclosure proceedings were used to collect the debt.[251]

The FDCPA applies to "debts" defined as:

The term "debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

In this case Wells Fargo, through its agent Harmon, notified Plaintiffs that their debt was accelerated and that they could make payments by contacting Harmon. Thus the language of the mortgage and *Wilson* suggest that the Motion for Judgment of the Pleadings should be denied.

In *Manson v GMAC*, 08-12166 (D.MA., 2012), the District Court denied a Motion to Dismiss a class action on FDCPA grounds despite the  assertion of the *Speleos* holding. The Court pointed out the holding of Speleos which was ignored::

With respect to the FDCPA claims, the defendant law firms contend that "foreclosure is not debt collection."[37] Law Firm Defs.' Opp'n at 12. They rely on *Speleos v. BAC Home Loans Servicing, L.P.,* 2011 WL 4899982, (D. Mass. Oct. 14, 2011), for the proposition that the law firms "cannot be held liable under the general provisions of § 1692(f) because [they were] not collecting a debt but rather enforcing a security interest." *Id.* at *6. Plaintiffs, for their part, argue that when *Speleos* is read further, defendants' argument collapses.

Defendant may, of course, still be liable under § 1692f(6), which is specifically applicable to the enforcement of security interests. *See Maynard v. Cannon, P.C.,* 650 F. Supp. 2d 1138, 1142-43 (D. Utah 2008) (holding that law firm engaged solely to initiate a nonjudicial foreclosure by enforcing the security interest was subject only to § 1692f(6)). That subsection prohibits enforcing such an interest where there is "no present right to possession of the property claimed as collateral." § 1692f(6)(A). The question is thus whether HarmonMoran foreclosed on the Property when there was no present right to possess it.

*Id.* Here, as noted in *Speleos,* the law firms were attempting to enforce a security interest when they lacked authority to do so. "A court should look to state law requirements to determine whether there was a present right to possession under the FDCPA." *Id.,* quoting *Revering v. Norwest Bank Minn., N.A.,* 1999 WL 33911360, at *5 (D. Minn. Nov. 30, 1999). General Laws ch. 244, §14, is conclusive on the issue: if a violation of the statute occurred then the law firm defendant in question had no present right to possession, and the FDCPA protections are triggered. The circle, however, remains unbroken. *If* a section 14 violation occurred, *then* the law firm whose client is implicated may be liable under the FDCPA.

In short, the Defendant's position fails due to the specific pleading in the Plaintiff's complaint of liability under the FDCPA.

Another claim which Wells Fargo did not address in its Memorandum or Motion, is that Wells Fargo was liable for making a false statement as to the amount of the debt owed by the Plaintiffs in the monthly statements sent in the name of Wells Fargo Home Mortgage from May 1, 2015 through May 1, 2016 and now ongoing, which would be the subject of an amended complaint. This allegation was contained in paragraph 17d:

On every monthly statement sent to the Plaintiffs from March 1, 2015, Defendant, Wells Fargo made a false statement as to the amount of the debt of the Plaintiffs in an attempt to collect a debt.

Defendant denied this allegation, but did not address it in its memorandum. Since it was not addressed as to the substantive violation of 15 U.S.C.§1692e(2)(a) which prohibits such conduct. The monthly statements sent to the Plaintiffs for each month other than May, June July and August, 2015 contained fees and expenses attributable to the improperly commenced foreclosure and all collection charges for postage and mailing and legal fees since the Plaintiffs became delinquent on their loan. Such statements were an attempt to collect a debt on behalf of either Wells Fargo Bank, N.A, or Freddie Mac as alleged in the complaint. Such violation arises from the incorrect amount of the obligation listed on each statement. Thus this aspect of the complaint cannot be the subject of the Motion for Judgment on the Pleadings because Wells Fargo using the fictitious name of Wells Fargo Home Mortgage chose not to seek relief as to this portion of the complaint.

## 15 U.S.C. §1638, 1640 AND 12 C.F.R. §1026.41 IMPOSE LIABILITY ON THE DEFENDANTS, WELLS FARGO BANK, N.A OR FEDERAL HOME LOAN MORTGAGE CORPORATION FOR FAILURE TO SEND THE PLAINTIFFS PERIODIC STATEMENTS OR TO SEND ACCURATE STATEMENTS

The Truth in Lending Act in 15 U.S.C. §1638 provides:

**(f)PERIODIC STATEMENTS FOR RESIDENTIAL MORTGAGE LOANS**

**(1)IN GENERAL** The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement setting forth each of the following items, to the extent applicable, in a conspicuous and prominent manner:

**(A)**

The amount of the principal obligation under the mortgage.

**(B)**

The current interest rate in effect for the loan.

**(C)**

The date on which the interest rate may next reset or adjust.

**(D)**

The amount of any prepayment fee to be charged, if any.

**(E)**

A description of any late payment fees.

**(F)**

A telephone number and electronic mail address that may be used by the obligor to obtain information regarding the mortgage.

**(G)**

The names, addresses, telephone numbers, and Internet addresses of counseling agencies or programs reasonably available to the consumer that have been certified or approved and made publicly available by the Secretary of Housing and Urban Development or a State housing finance authority (as defined in section 1441a–1 of title 12).

**(H)**

Such other information as the Board [2] may prescribe in regulations.

In the Dodd Franks Act, Congress authorized the promulgation of
Regulation Z, which filled in the gaps of subsection H. This regulation referenced
as 12 C.F.R. 1026.41 provides:

§ 1026.41 Periodic statements for residential mortgage loans.

**(a) *In general***

**(1) *Scope.*** This section applies to a closed-end consumer credit transaction secured by a dwelling, unless an exemption in paragraph (e) of this section applies. A closed-end consumer credit transaction secured by a dwelling is referred to as a *mortgage loan* for purposes of this section.

**(2) *Periodic statements.*** A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement meeting the requirements of paragraphs (b), (c), and (d) of this section. If a mortgage loan has a billing cycle shorter than a period of 31 days (for example, a bi-weekly billing cycle), a periodic statement covering an entire month may be used. For the purposes of this section, *servicer* includes the creditor, assignee, or servicer, as applicable. A creditor or assignee that does not currently own the mortgage loan or the mortgage servicing rights is not subject to the requirement in this section to provide a periodic statement.

**(b) *Timing of the periodic statement.*** The periodic statement must be delivered or placed in the mail within a reasonably prompt time after the payment due date or the end of any courtesy period provided for the previous billing cycle.

**(c) *Form of the periodic statement.*** The servicer must make the disclosures required by this section clearly and conspicuously in writing, or electronically if the consumer agrees, and in a form that the consumer may keep. Sample forms for periodic statements are provided in appendix H-30. Proper use of these forms complies with the requirements of this paragraph (c) and the layout requirements in paragraph (d) of this section.

**(d) *Content and layout of the periodic statement.*** The periodic statement required by this section shall include:

**(1)** *Amount due.* Grouped together in close proximity to each other and located at the top of the first page of the statement:

**(i)** The payment due date;

**(ii)** The amount of any late payment fee, and the date on which that fee will be imposed if payment has not been received; and

**(iii)** The amount due, shown more prominently than other disclosures on the page and, if the transaction has multiple payment options, the amount due under each of the payment options.

**(2)** *Explanation of amount due.* The following items, grouped together in close proximity to each other and located on the first page of the statement:

**(i)** The monthly payment amount, including a breakdown showing how much, if any, will be applied to principal, interest, and escrow and, if a mortgage loan has multiple payment options, a breakdown of each of the payment options along with information on whether the principal balance will increase, decrease, or stay the same for each option listed;

**(ii)** The total sum of any fees or charges imposed since the last statement; and

**(iii)** Any payment amount past due.

**(3)** *Past Payment Breakdown.* The following items, grouped together in close proximity to each other and located on the first page of the statement:

**(i)** The total of all payments received since the last statement, including a breakdown showing the amount, if any, that was applied to principal, interest, escrow, fees and charges, and the amount, if any, sent to any suspense or unapplied funds account; and

**(ii)** The total of all payments received since the beginning of the current calendar year, including a breakdown of that total showing the amount, if any, that was applied to principal, interest, escrow, fees and charges, and the amount, if any, currently held in any suspense or unapplied funds account.

**(4)** *Transaction activity.* A list of all the transaction activity that occurred since the last statement. For purposes of this paragraph (d)(4), *transaction activity* means any activity that causes a credit or debit to the amount currently due. This list must include the date of the transaction, a brief description of the transaction, and the amount of the transaction for each activity on the list.

(**5**) *Partial payment information.* If a statement reflects a partial payment that was placed in a suspense or unapplied funds account, information explaining what must be done for the funds to be applied. The information must be on the front page of the statement or, alternatively, may be included on a separate page enclosed with the periodic statement or in a separate letter.

(**6**) *Contact information.* A toll-free telephone number and, if applicable, an electronic mailing address that may be used by the consumer to obtain information about the consumer's account, located on the front page of the statement.

(**7**) *Account information.* The following information:

(**i**) The amount of the outstanding principal balance;

(**ii**) The current interest rate in effect for the mortgage loan;

(**iii**) The date after which the interest rate may next change;

(**iv**) The existence of any prepayment penalty, as defined in§ 1026.32(b)(6)(i), that may be charged;

(**v**) The Web site to access either the Bureau list or the HUD list of homeownership counselors and counseling organizations and the HUD toll-free telephone number to access contact information for homeownership counselors or counseling organizations; and

(**8**) *Delinquency information.* If the consumer is more than 45 days delinquent, the following items, grouped together in close proximity to each other and located on the first page of the statement or, alternatively, on a separate page enclosed with the periodic statement or in a separate letter:

(**i**) The date on which the consumer became delinquent;

(**ii**) A notification of possible risks, such as foreclosure, and expenses, that may be incurred if the delinquency is not cured;

(**iii**) An account history showing, for the previous six months or the period since the last time the account was current, whichever is shorter, the amount remaining past due from each billing cycle or, if any such payment was fully paid, the date on which it was credited as fully paid;

(**iv**) A notice indicating any loss mitigation program to which the consumer has agreed, if applicable;

**(v)** A notice of whether the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, if applicable;

**(vi)** The total payment amount needed to bring the account current; and

**(vii)** A reference to the homeownership counselor information disclosed pursuant to paragraph (d)(7)(v) of this section.

**(e)** *Exemptions*

**(1)** *Reverse mortgages.* Reverse mortgage transactions, as defined by § 1026.33(a), are exempt from the requirements of this section.

**(2)** *Timeshare plans.* Transactions secured by consumers' interests in timeshare plans, as defined by 11 U.S.C. 101(53D), are exempt from the requirements of this section.

**(3)** *Coupon books.* The requirements of paragraph (a) of this section do not apply to fixed-rate loans if the servicer:

**(i)** Provides the consumer with a coupon book that includes on each coupon the information listed in paragraph (d)(1) of this section;

**(ii)** Provides the consumer with a coupon book that includes anywhere in the coupon book:

**(A)** The account information listed in paragraph (d)(7) of this section;

**(B)** The contact information for the servicer, listed in paragraph (d)(6) of this section; and

**(C)** Information on how the consumer can obtain the information listed in paragraph (e)(3)(iii) of this section;

**(iii)** Makes available upon request to the consumer by telephone, in writing, in person, or electronically, if the consumer consents, the information listed in paragraph (d)(2) through (5) of this section; and

**(iv)** Provides the consumer the information listed in paragraph (d)(8) of this section in writing, for any billing cycle during which the consumer is more than 45 days delinquent.

**(4)** *Small servicers*

**(i)** *Exemption.* A creditor, assignee, or servicer is exempt from the requirements of this section for mortgage loans serviced by a small servicer.

**(ii)** *Small servicer defined.* A small servicer is a servicer that:

**(A)** Services, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the servicer (or an affiliate) is the creditor or assignee;

**(B)** Is a Housing Finance Agency, as defined in 24 CFR 266.5; or

**(C)** Is a nonprofit entity that services 5,000 or fewer mortgage loans, including any mortgage loans serviced on behalf of associated nonprofit entities, for all of which the servicer or an associated nonprofit entity is the creditor. For purposes of this paragraph (e)(4)(ii)(C), the following definitions apply:

**(1)** The term "nonprofit entity" means an entity having a tax exemption ruling or determination letter from the Internal Revenue Service under section 501(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 501(c)(3); 26 CFR 1.501(c)(3)-1), and;

**(2)** The term "associated nonprofit entities" means nonprofit entities that by agreement operate using a common name, trademark, or servicemark to further and support a common charitable mission or purpose.

**(iii)** *Small servicer determination.* In determining whether a servicer satisfies paragraph (e)(4)(ii)(A) of this section, the servicer is evaluated based on the mortgage loans serviced by the servicer and any affiliates as of January 1 and for the remainder of the calendar year. In determining whether a servicer satisfies paragraph (e)(4)(ii)(C) of this section, the servicer is evaluated based on the mortgage loans serviced by the servicer as of January 1 and for the remainder of the calendar year. A servicer that ceases to qualify as a small servicer will have six months from the time it ceases to qualify or until the next January 1, whichever is later, to comply with any requirements from which the servicer is no longer exempt as a small servicer. The following mortgage loans are not considered in determining whether a servicer qualifies as a small servicer:

**(A)** Mortgage loans voluntarily serviced by the servicer for a creditor or assignee that is not an affiliate of the servicer and for which the servicer does not receive any compensation or fees.

**(B)** Reverse mortgage transactions.

**(C)** Mortgage loans secured by consumers' interests in timeshare plans.

**(5)** *Consumers in bankruptcy.* A servicer is exempt from the requirements of this section for a mortgage loan while the consumer is a debtor in bankruptcy under Title 11 of the United States Code.

The provisions of TILA impose liability on the creditor, which in this case is disputed by the Defendants. Plaintiffs alleged that Freddie Mac was the creditor and the owner of the mortgage loan, which was denied by the Defendants, who assert that Freddie Mac is only the investor, whatever that means. However the record title is in the name of Wells Fargo. Thus liability is imposed either on Freddie Mac or Wells Fargo for any noncompliance with the terms of section 1638 and Regulation Z , either by inaccurate statements or by no statements at all. Defendants have insisted that there actually was a foreclosure, ignoring the defective default notice. They contend that correct mortgage statements were sent, an assertion which essentially states that contrary to the specific allegations in the complaint alleging that the statements defective, they were in fact compliant. Such assertions cannot be the subject of a Motion for Judgment on the Pleadings where like a Motion to Dismiss, all allegations of the complaint are alleged to be true.

The Defendants suggest that there is no liability for the failure to send Plaintiffs any statements for four months. They contend ,without legal support, that regardless of the lack of a default notice, which was a precondition to acceleration and sale as discussed above, there actually did occur a foreclosure

sale, which only they could rescind.  As a result, they contend that the sale was not

void from the outset and that it was never so determined by a Court and thus the

obligation was no longer secured by a dwelling.  This position is not supported by

any case law. In effect the Defendants seek to suggest that regardless of the

defective notice rendering the event they called a foreclosure,  that the terms of the

mortgage contract do not matter in such a matter. No foreclosure deed was

recorded and it was unnecessary to file a Court action to rescind a recorded deed.

Thus Defendants' argument is based on the contention that since they decided it

was a foreclosure sale, this Court must find in a Motion for Judgment on the

Pleadings that the sale did in fact occur and no mortgage existed for those four

months. Such position should be disregarded by the Court.

　　　　The final position taken by Freddie Mac is that since it is not loan servicer

and not subject to12 C.F.R. 1026.41, it cannot be liable under TILA. However this

argument misses the point of the regulation, which supplemented TILA section

1638H for additional information required by TILA to be placed on the monthly

statements.  TILA imposes the liability on the creditor, with the Regulation

identifying the matters that were required to be stated on the mandatory statements.

Each failure to provide such an accurate  statement or a statement at all is a TILA

violation carrying liability pursuant to 15 U.S.C 1640 of actual damages plus

statutory damages of between $400 and $4000 per violation plus legal fees and costs for the prosecution of the action.

## <u>CONCLUSION</u>

Plaintiffs have pleaded concise violations of the FDCPA by Wells Fargo, which were specific as to time and content of the violations. The have alleged actual damages as to legal fees incurred to seek legal redress against an improper non- judicial foreclosure without a valid default notice. Plaintiffs do not have to prove ill will or bad intentions on the part of Harmon. The statute is not based on negligence, as illegal actions without need to prove negligence or malice suffice. The FDCPA is a strict liability standard, as to which Plaintiffs have made specific allegations. As to the TILA claim, they have properly alleged liability for inaccurate and nonexistent statements since March 1, 2015. They are also prepared to file an Amended Complaint, as indicated above, in the event that this Court determines that more specific allegations are necessary. For these reasons, the Motion for Judgment on the Pleadings should be denied.

Respectfully submitted,

June 13, 2016

/s/ John B. Ennis
JOHN B. ENNIS, ESQ. #2135
1200 Reservoir Avenue
Cranston, Rhode Island 02920
(401) 943-9230
jbelaw@aol.com

<u>CERTIFICATION</u>

I hereby certify that I emailed a copy of the within Memorandum of Law to the following on the 13th day of June, 2016.

David E. Failkow, Esq.
K & L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
David.fialkow@klgates.com

Scott C. Owens, Esq.
Harmon Law Offices, PC
150 California Street
Newton, MA 02458
sowens@harmonlaw.com

/s/ John B. Ennis